430 F.2d 1225
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 825, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO and Peter Weber, William Duffy and John Pierson, Respondents.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 825, AFL-CIO, Peter Weber, its Business Manager, Respondents.
 No. 17091.
 No. 17092.
 United States Court of Appeals, Third Circuit.
 Argued April 8, 1970.
 Decided August 25, 1970.
 
 Robert A. Giannasi, N.L.R.B., Washington, D. C., for petitioner.
 Earl S. Aronson, Newark, N. J., for respondents.
 Before HASTIE, Chief Judge, and FREEDMAN and VAN DUSEN, Circuit Judges.
 OPINION
 HASTIE, Chief Judge.
 
 
 1
 The present proceeding was initiated by a petition of the National Labor Relations Board praying, inter alia, that Local 825, International Union of Operating Engineers, be adjudged in civil contempt by reason of alleged secondary boycotting in violation of decrees of this court entered on October 22, 1963 at Docket No. 14,318 and on August 5, 1966 at Docket No. 15,928, that required the union to cease and desist from coercing neutral employers or inducing their employees to stop working with an objective of causing any neutral employer to cease doing business with a party to a labor dispute.
 
 
 2
 After an answer had been filed and certain motions had been adjudicated, this court appointed Honorable Albert B. Maris, a Senior Circuit Judge, as special master to summon witnesses and to conduct hearings on the matters in dispute, to report findings of fact and conclusions of law and to recommend to this court appropriate dispositive action. Judge Maris conducted hearings for eight days and heard 42 witnesses. After fully hearing the parties on the facts and applicable law, he filed an elaborate report in which he summarized and evaluated the evidence concerning the several occurrences alleged to constitute contempt of the orders of this court, made detailed findings of fact, set out conclusions of law predicated on his fact-finding and recommended that this court adjudge the union in contempt of its decrees and impose specified sanctions. After a hearing at which the union presented its objections to the special master's report, the court is now in position to take dispositive action.
 
 
 3
 Preliminarily, the union has argued that the alleged wrongs cannot constitute civil contempt because the episodes in question occurred and were concluded some time ago, so that only a punitive criminal proceeding, as distinguished from a remedial civil one, can be appropriate.
 
 
 4
 Whether this contention might have merit where a single act of contumacy has been charged, we need not and do not decide. In this case unlawful secondary boycotting of the kind prohibited by our decrees is said to have occurred on four occasions involving different neutral employers and employees. Indeed, two of these episodes are alleged to have occurred after a rule to show cause had issued on the present contempt citation and were added to the wrongs charged in this proceeding on petition of the Board. If such repeated violations of particular prohibitory decrees of this court have occurred, a civil proceeding is appropriate to determine whether the misconduct amounted to contempt and, if so, what civil sanctions are appropriate and reasonably calculated to cause the union to abandon a course of intermittent flouting of our decrees whenever such misconduct may seem to serve its purposes.
 
 
 5
 The charge of contempt is based upon alleged occurrences at different times on four different construction sites. In each case, there was a "primary" employer with whom the union allegedly had a dispute. Each occurrence involved alleged union misconduct in relation to a different "neutral" employer or his employees. Like the special master, we have considered each occurrence separately.
 
 
 6
 OFFICE BUILDING CONSTRUCTION AT SOUTH BOUND BROOK
 
 
 7
 The special master's conclusion was that the union had induced employees of United Crane & Shovel Service Co. and Allan Bros. & O'Hara, neutral employers, to refuse to work for their employers and had coerced those employers with an object of forcing them to cease doing business with Morin Erection Co., a primary disputant.
 
 
 8
 The union contends, as it did before the special master, that the employees of United who were induced to stop work were also employees of Morin so that there was no secondary boycott. However, the evidence concerning the status of these employees and the role of United as the employer who hired them and retained the right to control them justified the special master's finding that the employees in question were employees of the neutral United, and of United alone. Separately, the union characterizes as mere "conjecture" the special master's finding that the work stoppage by these employees was induced by remarks of a union agent. All of the circumstances considered we think the special master's finding as to the cause of the work stoppage represented a clearly reasonable inference from the evidence as to the attendant circumstances, including the things said and done shortly before the work stoppage.
 
 
 9
 The union also argues that the evidence shows that it did not "threaten" or "coerce" the neutral employers but rather that it merely advised them of its dispute with Morin and solicited their help in achieving a fair settlement. While no threatening words were used we find sufficient evidence of coercive pressure upon neutrals to support the special master's conclusion that prohibited coercion occurred. In this connection we observe that though Morin was conducting a small operation at one end of a large job site with two entrances, the entire site was picketed beginning early in the morning before Morin's men began work.
 
 ESSEX COUNTY COURTHOUSE CONSTRUCTION AT NEWARK
 
 10
 The special master has found that, with an object of forcing Petillo Bros., a neutral employer, to cease doing business with S. S. Silberblatt, Inc., an employer engaged in a primary dispute with the union, the union coerced Petillo Bros. and induced its employees to refuse to work.
 
 
 11
 The union urges that the present record does not provide adequate evidentiary support for the special master's finding that the union member, a lead engineer, who told the neutral employer to stop work acted as agent for the union. However, on conflicting evidence the special master reasonably found that the lead engineer acted in representative capacity with the knowledge and assent of the union. It is relevant in this connection that after a work stoppage had begun a higher and unquestionably responsible union officer refused to approve the resumption of work by the neutral employer under his contract with the primary disputant.
 
 
 12
 We find no merit in the union's separate argument that the record does not justify the special master's finding that the union representative coerced the neutral employer.
 
 SCHOOL CONSTRUCTION SITE AT CORNWALL, NEW YORK
 
 13
 The special master found that the union had induced employees of Hambly Construction Co. to refuse to work for their employer and had coerced the employer Hambly with an object of compelling Hambly to cease doing business with Kondracki & Sons, an employer with whom the union had a labor dispute.
 
 
 14
 Disputing this conclusion, the union argues that the "work stoppage" upon which the claim of union wrongdoing is predicated was no more than a routine "coffee break." The record does show that the employees stopped work at about the time when normally they would take a morning coffee break. But there is evidence that they remained idle after the coffee truck left and did not resume work until the primary disputant Kondracki, an earth moving contractor, left the job.
 
 
 15
 However, there is another aspect of the work stoppage and the related temporary removal of the primary disputant from the job. Kondracki was engaged in bulldozing and it does not appear that the operating engineers had any direct interest in such work as he was doing, although the union was concerned that Kondracki's employees were members of an unaffiliated labor organization that the union did not recognize. On the other hand, a third union, the Teamsters, did actively object to the operation of Kondracki's bulldozer by members of a rival union. Indeed, there is evidence that a Teamsters' representative threatened Hambly because of Kondracki's presence on the job. The Teamsters' representative, as well as respondent's representative and other union agents, was at the job site the day the work stoppage occurred and Kondracki was compelled to withdraw. Moreover, it does not appear that the respondent union's representative did more than tell Kondracki, the primary disputant, that he was going to contact the building trades about picketing the job. An employee of Hambly overheard this conversation and reported it to his superior. We think this permissible threat directed to Kondracki does not amount to a clear and convincing showing that the respondent coerced Hambly or induced Hambly's employees to stop work, particularly when there is evidence that the coercion to which Hambly was subjected came from another more immediately concerned union.
 
 
 16
 Accordingly, we will not adopt the special master's conclusion that the respondent engaged in contemptuous misconduct in connection with the school construction project at Cornwall, New York.
 
 ROYAL LUBRICANT CONSTRUCTION SITE AT HANOVER
 
 17
 The special master found that the union, with an object of forcing neutral employers to stop doing business with Morin Erection Co., a contractor engaged in a primary dispute with the union, induced employees of Hermes & Young, Inc., a neutral employer, to stop work and coerced another neutral employer, Becker Construction Co.
 
 
 18
 Here, as in the controversy at the Essex County Courthouse site, the union contends that the lead engineer for whose conduct the union has been held responsible did not act as a union representative. However, there is credible evidence that, after protesting to subcontractor Morin and to the neutral principal contractor about Morin's use of a non-union operator of a welding machine, the lead engineer reported his activity to the union's business agent and thereafter continued his activity in the interest of the union without any union disavowal. The special master's finding that the union acted through the lead engineer was amply justified by the evidence.
 
 
 19
 The union also contends that the evidence does not warrant a finding that the lead engineer coerced a neutral employer. However, there is credible evidence that he urged the neutral contractor to cancel Morin's contract unless he should employ a union engineer and stated that a work stoppage would occur unless something should be done about this. The special master's finding of prohibited coercion of a neutral is adequately supported by the evidence.
 
 
 20
 More generally, we have considered the union's contention that such secondary activity as occurred on each of the projects now under consideration is not significantly different from the activity we refused to proscribe in NLRB v. Local 825, IUOE, 3 Cir., 1964, 326 F.2d 218 and NLRB v. Local No. 825, IUOE, 3 Cir., 1969, 410 F.2d 5, cert. granted 397 U.S. 905, 90 S.Ct. 899, 25 L.Ed.2d 86. However, in each of the situations where we now find contempt, the special master has found, we think properly, that the objective of union pressure upon the neutral contractor was to compel that contractor at least to suspend a contractual dealing with the primary disputant so long as the dispute with the union remained unsettled. I was because, in our judgment, the record did not warrant such a finding in the cited cases that we reached a different result.
 
 THE REMEDY
 
 21
 In our earlier discussion of jurisdiction we concluded that the misconduct of the union was such as might properly support a charge of civil contempt and the imposition of sanctions. We now consider whether the sanctions recommended by the special master are appropriate and should be imposed.
 
 
 22
 The union objects to a recommendation that it reimburse the Board for all expenses, including attorneys' fees, incurred in prosecuting this contempt proceeding. In so doing, the union incorrectly views such an imposition as punitive. Actually, it is no more punitive than awards of costs and attorneys fees that frequently are made in ordinary civil cases. Moreover, the Supreme Court has repeatedly recognized the compensation of the complainant for losses or expenses incurred because of the wrongdoing as an appropriate part of the remedy in civil contempt cases. E. g., McComb v. Jacksonville Paper Co., 1949, 336 U.S. 187, 69 S.Ct. 497, 93 L. Ed. 599; United States v. United Mine Workers of America, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884. We find this sanction appropriate.
 
 
 23
 The union also objects to the special master's recommendation that the remedy include a present determination that each future flouting of the decrees now found to have been violated, shall subject the union to the payment of a compliance fine of $10,000 plus $1,000 per day for each day that such a violation shall continue. We have imposed such contingent compliance fines in other cases. NLRB v. Local 676, Teamsters Union, No. 15,259, order of March 25, 1969; NLRB v. General Precision, Inc., No. 16,132, order of August 4, 1967. This type of sanction is particularly appropriate here because the record shows that repeated violations of the decrees in question have occurred at different times and places. To deter the continuation of this intermittent course of conduct is a proper remedial objective served by the proposed contingent compliance fine. Of course, if any charge of future violation is made, the charge must be established by clear and convincing proof before there can be an adjudication of contempt and a consequent imposition of the specified compliance fine.
 
 
 24
 The proposed remedy also includes requirements that notices of this adjudication coupled with a promise of future compliance be posted at appropriate places, read at specified membership meetings and distributed both to the individual members of the union and to all employers with whom the union had signed contracts. The union contends that these requirements, other than the posting of notices, are both unnecessary and demeaning. In our view, however, their purpose and probable cumulative effect is to inhibit the repetition of such violations as have been disclosed here by encouraging union members and employers to exert their influence against the recrudescence of wrongdoing by union officers and agents.
 
 
 25
 The findings and conclusions of the special master, other than those concerning the occurrence at the Cornwall Elementary School site, will be adopted and the recommended sanctions will be imposed. An appropriate decree may be submitted.
 
 
 26
 Judge Freedman would also approve the special master's conclusion that the respondent engaged in contemptuous misconduct in connection with the school construction project at Cornwall, New York.